***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between Plaintiff and the Defendant-Employer on October 1, 1999, the date of the subject accident, and at all other relevant times.
3. Plaintiff sustained a compensable injury by accident on October 1, 1999 while working for Defendant-Employer.
4. The carrier on the risk is The North Carolina Guaranty Fund.
5. In addition, the parties have stipulated to the following documents: (a) Industrial Commission forms; (b) medical records; and (c) a letter from Alfred L. Rhyne III, M.D.
 ***********
Based on the foregoing stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, Plaintiff was 43 years old. Defendant-Employer, an interstate trucking company, employed him as a truck driver.
2. On or about May 15-17 1999, Plaintiff developed low back pain, primarily on the left side, with radiation into the left hip and intermittent numbness in his left foot after lifting numerous cases of wine he was transporting pursuant to his job duties.
3. On July 1, 1999, Plaintiff saw Dr. James Lipsey, who ordered an MRI of Plaintiff's lumbar spine and took Plaintiff out of work. The MRI showed "degenerative disc disease with small central protrusion at L5-S1." By mid-July, Plaintiff reported improvement and he was able to return to work as a truck driver.
4. On October 1, 1999, Plaintiff was in his trailer, lifting and moving cases of wine, which had shifted during travel, when he felt pain in his back and left lower hip. Defendants accepted this incident as compensable.
5. After returning to North Carolina, Plaintiff presented to Dr. Lipsey on October 14, 1999 with complaints of pain in his "low back on the left, with radiation into the left hip posteriorly and distally into the lower extremities." Dr. Lipsey prescribed a lumbar spine MRI, which revealed a large herniated disk at L5-S1, more to the left side and larger than the previous one. Dr. Lipsey concluded that the second incident of October 1, 1999 exacerbated the original injury Plaintiff sustained on or about May 16, 1999.
6. On December 8, 1999, Dr. Lipsey performed a partial hemilaminectomy at L5-S1 and a partial hemilaminectomy at L4-L5. However, following that surgery and his return to light duty work, Plaintiff had persistent pain in his left hip. A subsequent MRI confirmed a recurrent disc herniation at L5-S1 with significant displacement of the left S1 nerve root. Consequently, Dr. Lipsey referred the Plaintiff for a neurosurgical evaluation by Dr. Richard E. Weiss.
7. Dr. Weiss recommended a left L5-S1 microlumbar diskectomy, which he performed on July 1, 2000. Following that surgery and his return to light duty work, Plaintiff still experienced persistent left hip and leg pain. In response, Dr. Weiss prescribed a repeat MRI on 2 October 2000, which confirmed yet another large recurrent disc herniation on the left at L5-S1.
8. On November 20, 2000, Dr. Weiss performed a repeat left L5-S1 microlumbar diskectomy. Following this third lumbar surgery, Plaintiff began experiencing burning sensations in his left leg. In response, Dr. Weiss recommended a repeat MRI, which was performed on 2 February 2001. Dr. Weiss and an associate neurosurgeon, Dr. Jon M. Silver concluded that the MRI showed another recurrent disc herniation, at L5-S1.
9. Plaintiff presented to Dr. Mark Moody, an orthopaedic surgeon, at Defendants' request. Dr. Moody recommended a revision microlumbar diskectomy left L5-S1. Plaintiff presented to Dr. Alfred Geissele for an additional opinion at Defendants' request. Dr. Geissele recommended a revision diskectomy posteriorly and a posterolateral fusion with posterior instrumentation, followed by an anterior interbody fusion.
10. Defendants requested that Dr. Silver, who had previously reviewed the February 2, 2001 MRI and conferred with Dr. Weiss, evaluate Plaintiff.
11. On May 19, 2001, prior to the scheduled examination with Dr. Silver, Plaintiff fell at his home, injuring his right knee, which began to swell and hurt. Plaintiff's fall was caused by numbness in his legs and feet, which was related to his lumbar spine injuries, and therefore accepted as compensable by Defendants.
12. On June 21, 2001, Dr. Silver evaluated Plaintiff's persistent low back and bilateral leg pain. Pursuant to that evaluation and Dr. Silver's recommendation, Dr. Silver performed a fourth lumbar spine surgery which entailed stealth guided TSRH pedicle screw instrumentation with interbody fusion (utilizing tangent bone), posterior lateral fusion and decompression on July 26, 2001.
13. On February 27, 2002, Plaintiff came under the care of orthopaedic surgeon Dr. Charles J. DePaolo, for assessment of his right knee injury. On May 5, 2002, Dr. DePaolo performed a right lateral meniscectomy, chondroplasty and ACL reconstruction of the Plaintiff's right knee.
14. Plaintiff participated in prescribed physical therapy for approximately six months between May 15 and December 10, 2002. During his first 5 weeks, Plaintiff used crutches to ambulate at home and to and from physical therapy and during his physical therapy visits. On the days he participated in physical therapy, he was on his crutches about four to five hours per day, and when not attending physical therapy, he used his crutches for about two hours per day.
15. In July of 2002, during his physical therapy program, Plaintiff began to experience new pain, which he described as originating between his left shoulder and neck but as not being too significant. Plaintiff's focus was on his knee rehabilitation, and he did not immediately report these new symptoms to the therapist. Plaintiff associated the onset of these symptoms to his use of crutches during physical therapy.
16. Plaintiff's symptoms progressed over the next months while he participated in physical therapy. At his September 9, 2002 visit and in subsequent visits, Plaintiff complained about numbness in his left shoulder. He also reported these left shoulder symptoms to Dr. DePaolo on November 18, 2002.
17. At Plaintiff's January 13, 2003 visit, Dr. DePaolo determined that his right knee was at maximum medical improvement and assigned a twelve percent (12%) permanent impairment rating to the right knee. Dr. DePaolo stated that he would assign Plaintiff permanent restrictions based upon FCE results.
18. Plaintiff's shoulder and neck symptoms continued to progress following his release from Dr. DePaolo for his knee injury. On March 12, 2003, Plaintiff presented to Dr. DePaolo with complaints of "severe neck pain with radiation into the left arm, left elbow, left C8 dermatome." These symptoms prompted Dr. DePaolo to perform cervical spine x-rays which showed a loss of cervical lordosis and disc space narrowing at C4-5 and C6-7. Consequently, Dr. DePaolo ordered a cervical MRI, which revealed a left posterior lateral disk herniation at C6-7, which extended to the neural foramina with impingement on the left C7 nerve root, as well as a paracentral posterior lateral disk protrusion into the neural foramina of the left C6 nerve root.
19. Dr. DePaolo referred Plaintiff to Dr. Silver, who examined Plaintiff on May 13, 2003. Dr. Silver recommended and then performed a C5-C6 and C6-C7 anterior cervical diskectomy and fusion on August 25, 2003.
20. Defendants are denying that there is a causal connection between plaintiff's compensable back and knee injuries and his cervical spine problems. Plaintiff was disabled from work due to his compensable injuries at the time his cervical and shoulder problems developed and he is still receiving temporary total disability compensation.
21. Based on the greater weight of the evidence, Plaintiff did not experience the symptoms related to his cervical spine prior to his participation in physical therapy during the summer of 2002. During the six-month period that Plaintiff was in physical therapy, there is no evidence that Plaintiff engaged in any activities of daily living to which either Dr. Silver, Dr. DePaolo, or he could attribute to the onset of his neck symptoms.
22. Dr. Silver testified that he was not certain that he could relate Plaintiff's neck injury itself to his use of crutches, his participation in physical therapy or the original accident. At the same time, Dr. Silver was of the opinion that since Plaintiff's symptoms began during physical therapy, it was possible that Plaintiff's participation in therapy, his use of crutches, and the stressors on his neck during recovery could have aggravated his underlying neck condition. Dr. Silver further opined that the therapy most likely aggravated Plaintiff's neck condition to the point that it became symptomatic.
23. Dr. Silver testified that he would not have recommended or performed the neck surgery if not for the presence of Plaintiff's neck symptoms. Plaintiff testified that the neck surgery provided him great relief of his neck pain and shoulder pain.
24. Although he expressed some opinions in terms of possibilities, Dr. DePaolo opined to a reasonable degree of medical certainty, based on his treatment of Plaintiff and his review of medical records from other providers that Plaintiff's accident trauma was more likely than not a significant contributing factor in the development of Plaintiff's neck problems and the condition surgically treated by Dr. Silver. Dr. DePaolo also testified that although Plaintiff's use of crutches during physical therapy was not likely the cause of his cervical disc herniation, his use of crutches may have been a contributing factor to his cervical disc problems.
25. Significantly, Dr. DePaolo's testimony shows that often shoulder and neck complaints are closely related and that a patient may have difficulty distinguishing between the two. In Plaintiff's case, the pain was radiating from the neck into the shoulder and arm, which resulted in Plaintiff's complaints of shoulder pain. At the hearing before the deputy commissioner, Plaintiff pointed to his trapezius muscle as the location of his shoulder pain. Dr. DePaolo testified that "the trapezius arises from the cervical processes" and that pain in the trapezius muscle area could be coming from both the shoulder and cervical spine.
26. Based on the greater weight of the evidence, Plaintiff's cervical problems are causally related to his lower back injury and subsequent knee injury, which required the use of crutches. More likely than not, Plaintiff's neck injuries were caused during the initial accident of October 1, 1999, but his neck did not become symptomatic until later when Plaintiff was participating in physical therapy in the summer of 2002. Regardless of when the disc herniations were precipitated, the evidence shows that the additional stress placed on Plaintiff while participating in physical therapy aggravated his pre-existing neck condition to the point that it became symptomatic, necessitating the surgery performed by Dr. Silver.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On October 1, 1999, Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with Defendant-Employer. Defendants have accepted and are continuing to pay benefits for the injury to Plaintiff's lower back. N.C. Gen. Stat. §97-2(6).
2. On May 19, 2001, as a direct result of his compensable back injury, Plaintiff sustained an injury to his right knee. Defendants have also accepted and paid benefits for the injury to Plaintiff's right knee. N.C. Gen. Stat. § 97-2(6).
3. Plaintiff's neck injuries are causally related to the accident of October 1, 1999. Plaintiff's neck injuries were either caused by the accident or significantly aggravated by his subsequent participation in the related physical therapy during the summer of 2002. Holley v. Acts,Inc., 357 N.C. 228 (2003); Click v. Pilot Freight Carriers, Inc.,300 N.C. 164 (1980).
4. Plaintiff is entitled to and Defendants shall pay all medical expenses incurred for the treatment of his injuries so long as such treatments are reasonably required to effect a cure, give relief and/or lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
5. Plaintiff has not been evaluated for or assigned any permanent partial impairment rating to his cervical spine. Plaintiff's entitlement to permanent partial disability benefits, if any, should be reserved for subsequent determination.
6. Plaintiff's counsel has rendered valuable legal services and is entitled to an attorney's fee from any compensation that may be due and paid to Plaintiff as a consequence of his neck injuries, which have been found to be compensable. A fee of twenty-five percent of any compensation that may be payable to Plaintiff as temporary total disability or permanent partial disability benefits related to Plaintiff's neck injury is approved for Plaintiff's counsel. N.C. Gen. Stat. § 97-90.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to counsel fees hereinafter approved, Defendants shall pay to Plaintiff any disability compensation owed for his cervical condition.
2. Defendants shall pay all medical expenses incurred or to be incurred by Plaintiff as a result of his compensable cervical spine condition, including the care prescribed and provided by Dr. Silver and Dr. DePaolo. In addition, Defendants shall pay for an evaluation and rating of the permanent partial impairment (if any) to Plaintiff's cervical spine. Since no sum certain is awarded herein, the parties may, by agreement, pay amounts owed to Plaintiff on a Form 26 agreement.
3. Plaintiff's counsel is entitled to a reasonable attorney's fee of 25% of any compensation to which Plaintiff may be entitled based on this award.
4. Defendants shall pay the costs.
This the ___ day of February 2005.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER