***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Harris.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. An employee-employer relationship existed between Plaintiff and Defendant-Employer.
3. Liberty Mutual Insurance Company is the carrier on the risk.
 *********** ISSUE
1. Whether Plaintiff suffered the onset of a compensable occupational disease?
 *********** EXHIBITS
1. The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Plaintiff's medical records
 • Exhibit 3: Industrial Commission Forms
 • Exhibit 4: Parties' discovery responses
2. Transcripts of the depositions of the following were also received post-hearing:
 • William Brinkley
 • Mark Wiggins
 • Dr. Ibinkunle Ojebuoboh
 • Dr. Allen Hayes (with Defendants' Exhibit 1)
 ***********
Based upon all of the competent credible evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT *Page 3 
1. As of the date of the hearing before Deputy Commissioner Harris, Plaintiff was 59 years old, with a date of birth of December 10, 1949.
2. Plaintiff smoked approximately one pack of cigarettes per day from age 18 to age 36, at which point she stopped smoking. Plaintiff has not smoked a cigarette since age 36, and no one in her household smokes.
3. Plaintiff is approximately five feet tall and weighs approximately 235 pounds. Plaintiff has maintained roughly the same weight for years.
4. Defendant-Employer manufactures diesel systems, including diesel fuel pumps.
5. Plaintiff worked at Defendant-Employer's Jacksonville, North Carolina facility for approximately 30 years. For approximately the first 10 years of her employment, Plaintiff worked on various assembly lines. For the last 15 to 20 years of her employment with Defendant-Employer, Plaintiff worked as a pump tester.
6. As a pump tester, Plaintiff's job involved quality control. Plaintiff placed each assembled pump on a stand and connected a hose which injected an oily fluid into the pump. Plaintiff then used a black light to conduct a 60-point inspection to determine whether any fluid leaked out of the pump. A dye was added to the fluid which glowed under the black light if it leaked out of the pump. When the cycle was completed, Plaintiff removed the pump from the stand and drained the fluid out of it.
7. Plaintiff wore ear protection, an apron, and gloves while performing her pump tester job, however, she was not provided with any nose or mouth protection. Plaintiff noted that the oil had a "heavy" odor to it, and around 2004 she began to be bothered by the fumes.
8. The fluid used to test the pumps consisted of calibration oil with napthenic oil added for the dye component. *Page 4 
9. In 2004, Plaintiff's primary doctor at the time, Dr. Robert A. Krause, diagnosed Plaintiff with emphysema. Dr. Krause did not inform Plaintiff that her condition might be work-related.
10. After a hospital stay in 2004, Plaintiff returned to her pump tester position, however, the fumes continued to bother her.
11. On November 5, 2004, Plaintiff began treating with Dr. Ibinkunle Ojebuoboh as her primary physician. Dr. Ojebuoboh is board certified in internal medicine. One month later, after performing his own testing, Dr. Ojebuoboh diagnosed Plaintiff with chronic obstructive pulmonary disease ("COPD"), which is essentially the same as emphysema.
12. Plaintiff continued to work in her pump tester position, and the fumes continued to bother her. In July 2007, Dr. Ojebuoboh opined for the first time that Plaintiff had an occupational lung disease related to her exposure to oil fumes in her job with Defendant-Employer.
13. In May 2008, Dr. Ojebuoboh hospitalized Plaintiff for severe breathing problems which she experienced after working for six consecutive days. Dr. Ojebuoboh wrote Plaintiff out of work at that time.
14. Plaintiff has not worked since May 17, 2008.
15. As of the date of the hearing before Deputy Commissioner Harris, Plaintiff had been on oxygen, as prescribed by Dr. Ojebuoboh, for approximately one year.
16. Dr. Ojebuoboh based his July 2007 diagnosis of a possible occupational lung disease on the odor of chemicals that he detected on Plaintiff when she reported to his office with complaints of shortness of breath. He did not know what Plaintiff's job duties were or, *Page 5 
specifically, whether the calibration oil and/or the napthenic oil to which Plaintiff was routinely exposed on the job could cause COPD.
17. Dr. Ojebuoboh opined that Plaintiff's job materially aggravated her COPD. He based his opinion on his observation that Plaintiff was very symptomatic upon her arrival for appointments, having come directly from work. Dr. Ojebuoboh further opined that, because Plaintiff had not smoked for many years, the progression of her COPD had to be work-related.
18. When asked to give his opinion on whether Plaintiff faced an increased risk of developing COPD, compared to that faced by the general population, because of her job, Dr. Ojebuoboh opined that consistent long-term exposure to chemicals can initiate the COPD process, however, he could not specify which chemicals would have that effect.
19. Dr. Ojebuoboh agreed that Plaintiff's 18 year smoking history would be enough, in and of itself, to have caused her COPD, and he agreed that it was more likely that the smoking initially caused her COPD, as opposed to any exposure to chemicals. Dr. Ojebuoboh also agreed that Plaintiff's morbid obesity and sleep apnea could contribute to her deteriorating breathing problems.
20. Dr. Allen Hayes is a pulmonologist with an interest in occupational lung diseases who has worked with the Industrial Commission as an advisor and on its Occupational Textile Disease Panel during his 30-year medical career. Dr. Hayes has seen thousands of patients with COPD over the course of his career.
21. Dr. Hayes did not see Plaintiff, however, he reviewed her medical records as well as the results of air quality testing performed at Defendant-Employer's Jacksonville facility from 2000 through 2008. Those tests revealed no respiratory risk to individuals exposed to compounds which were the same as or similar to those to which Plaintiff was exposed. A 2008 test which *Page 6 
was performed to ensure compliance regarding the oils and mists which Plaintiff alleged had caused her COPD showed no violations of government and industry standard levels from a respiratory standpoint.
22. Dr. Hayes agreed that Plaintiff has COPD and opined that Plaintiff's COPD largely began with her smoking. Dr. Hayes further noted that the disease is progressive once it has started, even if the subject quits smoking. Specifically, Dr. Hayes agreed that Plaintiff's 18 pack year history was sufficient to cause COPD.
23. Dr. Hayes was not aware of any cases or prevalent examples of exposure to fumes from injector fluid or calibration oil or dye consisting of napthenic oil causing COPD, and he noted that oil fumes in general are not a typical cause of COPD. He opined that exposure to oil fumes in her job was not a causative factor in Plaintiff's development of COPD. Dr. Hayes also noted that, once a person has COPD, it is fairly easy to aggravate it through exposure to all kinds of fumes, and he agreed that the oil fumes could have temporarily aggravated Plaintiff's COPD. However, Dr. Hayes did not believe that oil fumes could accelerate the progression of COPD.
24. Dr. Hayes also did not note any increased risk for the development of COPD from working with the oils involved in this claim.
25. To the extent that Dr. Ojebuoboh would disagree with Dr. Hayes as to causation and increased risk in this claim, the Full Commission accords more weight to the opinions of Dr. Hayes. Although Dr. Hayes has not personally examined Plaintiff, he has undertaken a thorough review of the records, and he has advanced expertise on the subject of occupational lung diseases. Further, Dr. Ojebuoboh's opinions are based on incomplete information and appear to confuse sequence with consequence.
 *********** *Page 7 
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to show a causal connection between her job with Defendant-Employer and the onset and/or material aggravation of her COPD. With regard to the issue of proving medical causation, the North Carolina Supreme Court has held "that the entirety of causation evidence" must "meet the reasonable degree of medical certainty standard necessary to establish a causal link between" the plaintiff's accident and her injury.Holley v. ACTS, Inc.,357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003). Furthermore, in cases "where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury."Click v. Pilot Freight Carriers, Inc.,300 N.C. 164, 167, 265 S.E.2d, 389, 391 (1980). "Although expert testimony as to the possible cause of a medical condition is admissible[,] . . . it is insufficient to prove causation, particularly `when there is additional evidence or testimony showing the expert's opinion to be a guess or mere speculation.'"Holley, 357 N.C. at 233, 581 S.E.2d at 753.
2. In this case, Plaintiff has failed to meet the requirements set forth above. Since Dr. Ojebuoboh attributed the progression of Plaintiff's COPD to the fact that she had stopped smoking and then continued working with chemicals as part of her job, without investigating the chemicals used by Plaintiff, without testing any of the chemicals, and without identifying any chemical which causes COPD, and since he failed to express an opinion to a reasonable degree of medical certainty regarding the origin of Plaintiff's COPD, his opinions are given less weight. In contrast to Dr. Ojebuoboh, Dr. Hayes, who has advanced expertise on the subject of *Page 8 
occupational lung diseases, testified that there is no scientific or medical evidence establishing a link between COPD and any of the fumes, oil or dye to which Plaintiff was exposed.
3. Plaintiff has also failed to show that her job placed her at an increased risk, over that faced by the general population, for the development of COPD. Pursuant to N.C. Gen. Stat. § 97-53, Plaintiff must prove that she is suffering from an enumerated occupational disease or an unnamed disease which meets the criteria of N.C. Gen. Stat. § 97-53(13). As COPD is not enumerated as an occupational disease, Plaintiff must satisfy the terms of N.C. Gen. Stat. § 97-53(13) and prove: (1) the disease was characteristic of persons engaged in a particular trade or occupation in which the plaintiff is engaged; (2) the disease was not an ordinary disease of life to which the public is equally exposed; and (3) there was a causal connection between the disease and the plaintiff's employment. Rutledge v. Tultex Corp.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983).
4. In this case, Dr. Ojebuoboh failed to express an opinion to a reasonable degree of medical certainty regarding the origin of Plaintiff's COPD, while Dr. Hayes testified that the oils and dyes Plaintiff-Employee used in her job are not associated with obstructive lung disease, and would not place her at an increased risk for the development of COPD. As such, Plaintiff has failed to offer a credible basis for the conclusion that her employment placed her at an increased risk for the development of COPD, as compared to the general public not so employed or that her alleged occupational disease was caused by her employment.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD *Page 9 
1. Plaintiff's claim is DENIED.
2. Each side shall bear its own costs. As part of their costs, if they have not done so already, Defendants shall pay an expert witness fee to Dr. Hayes of $756.00 or the amount actually billed, whichever is less. It is noted that, by Order filed on April 30, 2009, Deputy Commissioner Harris set the expert witness fee for Dr. Ojebuoboh.
This the 22nd day of March, 2010.
 S/___________________
 DIANNE C. SELLERS
 COMMISSIONER
CONCURRING:
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/___________________ CHRISTOPHER SCOTT COMMISSIONER