* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At the time of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. On the occasion of the event described, the defendant-carrier was the carrier on the risk for the defendant-employer.
3. The date of loss shall be considered for the purposes of this proceeding to be September 21, 2006.
4. As of the date of loss, September 21, 2006, the average weekly wage of the plaintiff was $765.66.
5. Plaintiff started losing time from work on or about September 21, 2006, and does not currently work for the defendant-employer.
6. Plaintiff applied for and received short-term disability benefits (STD) which were employer funded.
7. Plaintiff applied for and received long-term disability benefits (LTD).
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 51 years of age, with a date of birth of July 31, 1959. She was employed with defendant-employer at the Eveready Battery plant in Asheboro, North Carolina, in August 1977, shortly after graduating from high school. Plaintiff worked as a Raw Cell Line Tender. Plaintiff was employed continuously by Eveready until she was placed on long term disability in February 2009 as a result of her right shoulder injury.
2. Plaintiff alleges that on September 21, 2006, she sustained an injury to her right shoulder. According to plaintiff, she was lifting up a cell tray above a boxer, the weight shifted, and she felt a tear or pop in her right shoulder. Plaintiff filed her Form 18 on October 2, 2006. *Page 3 
Defendants denied the claim via a Form 61. Plaintiff filed a Form 33 Request that Claim Be Assigned for Hearing on December 18, 2008. Defendants filed a Form 33R on the basis of lack of medical causation, pre-existing condition, and no injury by accident.
3. Plaintiff's primary care physician is Dr. John Cameron with White Oak Family Physicians. On December 12, 2002, several years prior to the alleged work-related incident, plaintiff presented to Dr. Cameron with right shoulder complaints. Dr. Cameron diagnosed impingement syndrome, which he described as "swelling" of the tendons, causing "pinching." Dr. Cameron noted several causes of impingent, to include repetitive activity, trauma, and degeneration. Dr. Cameron prescribed medication but did not perform any further diagnostics.
4. On August 3, 2006, also prior to the date of alleged injury in this matter, plaintiff presented to Orthopedic Surgery Center for a follow-up examination after a July 2006 hamstring injury. Plaintiff was seen by Dr. Thomas Osteen's physician's assistant, Ron Estes. During this examination, plaintiff complained of pain in her right shoulder and requested an examination. P.A. Estes noted that plaintiff had a history of a "chronically painful shoulder" and made an assessment of "suspect rotator cuff pathology."
5. On August 8, 2006, plaintiff returned to Orthopedic Surgery Center, at which time she was seen by Dr. Osteen. Plaintiff reported to Dr. Osteen that she had "right shoulder pain for the past several months, worse with overhead lifting." Dr. Osteen performed a diagnostic ultrasound of plaintiff's right shoulder, and he then diagnosed plaintiff with a partial rotator cuff tear.
6. Dr. Osteen discussed with plaintiff possible surgical treatment, a subacromial decompression, along with debridement and partial repair of the rotator cuff. Dr. Osteen and *Page 4 
plaintiff decided to try a conservative approach prior to pursuing surgery. Dr. Osteen administered a cortisone injection and recommended a home exercise program for six weeks.
7. Based upon the competent medical evidence of record, plaintiff suffered from a long-standing chronic right shoulder condition, including a partial rotator cuff tear, prior to the date of alleged injury, September 21, 2006. Prior to September 21, 2006, surgery had been recommended by Dr. Osteen.
8. On September 21, 2006, plaintiff claims to have suffered injury to her shoulder at approximately 12:15 p.m. In an Injury-Illness Report it is documented that plaintiff was lifting a sample tray from the boxer to the skid. This is a task performed every four to six weeks depending on how often the cell trays fill up. Plaintiff testified that she had performed this task only twice in the preceding ten months before her injury. Plaintiff claims to have felt a tear in her right shoulder. She took prescription Ibuprofen at lunch and she continued to work until her shift ended at 7:00 pm.
9. Part of plaintiff's regular job was to lift pans of batteries, weighing approximately 35 pounds, from waist level to a conveyor belt and from the conveyor belt to a skid. On the date of injury, plaintiff reported to her supervisor that she felt discomfort in her muscle "when moving the cell tray from the boxer to the skid."
10. Plaintiff's job duties included regularly lifting trays of batteries at waist level and plaintiff has performed this task throughout her career with defendant-employer. She has lifted battery trays over shoulder level in different positions in the past. Plaintiff was required to perform eye level and even overhead duties, to include replacing paper rolls and stacking bins. Overhead paper rolls are replaced approximately four times per shift. *Page 5 
11. Per the testimony of Jason Caviness, plaintiff's prior supervisor and trainer, waist level lifting of trays of batteries and waist level lifting of sample trays were a normal part of plaintiff's job duties. During a 12-hour shift, a worker would lift, on average, thirty 35-pound trays of batteries.
12. Plaintiff's description of her alleged injury shows that she was not performing one of her normal duties, and there was an unusual interruption of her work duties at the time she felt pain or a "tear" in her shoulder. Plaintiff testified that she had gone to a different line, Line 9, to assist at the time of this incident, the injury report indicates Plaintiff was on her usual line, Line 8. Plaintiff never mentioned this detail on injury reports on in discovery responses, and the first Mr. Caviness learned of this allegation was at the hearing. The Full Commission finds by the greater weight of the evidence that plaintiff experienced an unusual interruption of the work assigned as the weight she was lifting shifted as she was lifting the tray of batteries.
13. Plaintiff then played in a golf tournament the entire weekend following her alleged injury. Plaintiff is right-handed and swings her golf club with her dominant hand.
14. On September 25, 2006, plaintiff presented to Dr. John Cameron complaining of right shoulder pain and stating that the onset of pain was acute. Dr. Cameron mentions plaintiff previously had a confirmed tear in her right rotator cuff by Dr. Osteen's prior assessment and had a steroid injection two months prior.
15. On October 2, 2006, plaintiff returned to Dr. Osteen. She mentioned she had improved for the first four weeks after the injection. She reported she was then lifting a pan of batteries, and started having "increased pain" in the shoulder. Dr. Osteen noted specifically that plaintiff "has not responded to conservative treatment." As such, he recommended arthroscopic surgery and placed plaintiff on light duty with restrictions of no use of the right arm. *Page 6 
16. On October 13, 2006, an MRI of plaintiff's right shoulder was taken at Southeastern Radiology, which showed a labral injury that was "likely chronic." The MRI also showed multiple joint loose bodies, which is read to be a result of either osteochondromatosis and/or rheumatoid arthritis.
17. Dr. Osteen then diagnosed plaintiff with a full thickness tear of the supraspinatus of the rotator cuff. On October 27, 2006, Dr. Osteen performed arthroscopic surgery on plaintiff's right shoulder, which included a subacromial decompression and debridement, and repair of plaintiff's torn right rotator cuff. This was the same surgical procedure recommended on August 8, 2006, prior to the alleged accident.
18. On November 12, 2007, Dr. Donald Getz of Atlantic IME Services reviewed plaintiff's medical history and records. Dr. Getz is board certified as an Independent Medical Examiner. This certification includes, among other things "how to approach issues of causation." At the time Dr. Getz prepared his November 12, 2007, report and at the time of his deposition, he was not aware of whether his opinion had been solicited by defendants or plaintiff.
19. Dr. Getz' interpretation of the records is that plaintiff simply experienced a painful episode of her chronic condition. It is Dr. Getz' opinion that surgery was not necessitated by any September 21, 2006, incident. Dr. Getz' opinion, to a reasonable degree of medical certainty, is plaintiff's condition requiring surgery on October 27, 2009, was a continuation of the condition she had prior to the September 21, 2006, incident as opposed to an acute injury.
20. Plaintiff did not seek immediate medical attention after the alleged shoulder injury, but played in a golf tournament all weekend. As shown by the testimony of the physicians, and particularly Dr. Getz, playing golf that weekend would be inconsistent with an acute injury, particularly a complete rotator cuff tear. *Page 7 
21. Dr. Osteen was presented with all evidence, to include plaintiff's reported histories of injury. Dr. Osteen testified that it was "possible" plaintiff had an acute event; however, he could not say with certainty. Dr. Osteen further testified, "what that acute event was, I don't think any of us will be able to say." When asked whether Dr. Osteen could tell to a reasonable degree of medical certainly whether the event on September 21, 2006, progressed the partial rotator cuff tear to a full rotator cuff tear, Dr. Osteen responded, "[f]or sure, no."
22. Dr. Getz agreed there is no way to tell when happened between August 2006 and October 2006. While there was something going on with the rotator cuff, "beyond that, with any degree of certainty, you can't tell."
23. In weighing the opinions of the physicians, slightly more weight is given to that of Dr. Getz. However, even the testimony of Dr. Osteen fails to establish that plaintiff's alleged accident caused or aggravated the prior rotator cuff injury. The evidence fails to establish that the alleged incident caused the need for shoulder surgery, where the same had already been recommended.
24. Plaintiff was out of work for treatment for her rotator cuff injury. During her time out of work, she received both employer-funded short-term disability benefits and later long-term disability benefits, for which premiums were partially employer paid.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW *Page 8 
1. In a workers' compensation claim, the employee has the burden of proving that her claim is compensable. Henry v. A.C. LawrenceLeather Co., 231 N.C. 477, 479, 57 S.E.2d 760, 761 (1950).
2. With regard to proving medical causation, our Supreme Court has held "that the entirety of causation evidence" must "meet the reasonable degree of medical certainty standard necessary to establish a causal link." Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d. 750 (2003). In cases "where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury."Click v. Pilot Freight Carriers, Inc.,300 N.C. 164, 265 S.E.2d 389 (1980). "[A]lthough medical certainty is not required, an expert's `speculation' is insufficient to establish causation." Holley,357 N.C. at 234, 581 S.E.2d. at 754. Plaintiff has not met her burden of proof that any incident on September 21, 2006, caused or aggravated her shoulder condition.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 ORDER
1. Under the law, Plaintiff's claim must be, and is hereby, DENIED.
2. Each side shall bear its own costs.
This the 10th day of December, 2010.
 S/_________________ DANNY LEE McDONALD *Page 9 
COMMISSIONER
CONCURRING:
 S/____________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1